```
                    UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS (HOUSTON)

PLAINTIFF'S NAME,              .  Case No. 4:24-mj-00196
                              .
            Plaintiff,         .
                              .
     v.                       .
                              .
DEFENDANT'S NAME,             .  515 Rusk Street
                              .  Houston, TX 77002
            Defendant.        .
                              .  Thursday, May 30, 2024
. . . . . . . . . . . . . . . .  10:42 a.m.

         TRANSCRIPT OF PRELIMINARY EXAM AND DETENTION HEARING
            BEFORE THE HONORABLE RICHARD W. BENNETT
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:        DOJ-USAO
                          By:  JOHN SERGEI GANZ, ESQ.
                          1000 Louisiana Street, Suite 2300
                          Houston, TX 77002
                          (713) 567-9920

For the Defendant:        Foreman DeGeurin, et al.
                          By:  GEORGE M. DEGEURIN, JR., ESQ.
                          300 Main Street, 3rd Floor
                          Houston, TX 77002
                          (713) 655-9000



Audio Operator:           Brandis Isom, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com



     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

<u>I N D E X</u>
<u>5/30/2024</u>

| <u>WITNESSES</u> | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>FOR THE GOVERNMENT:</u> | | | | |
| Patrick Lewis | 5 | 37 | 56 | 58 |
| <u>FOR THE DEFENDANT:</u> | | | | |
| Juana Reinoso-Rodriguez | 60 | -- | -- | -- |

| <u>EXHIBITS</u> | <u>ADMITTED</u> |
|---|---|
| Government's Exhibit 1 | 10 |
| Government's Exhibit 2 | 12 |

1          (Proceedings commence at 10:42 a.m.)

2              THE COURT:  All right.  Court next calls United

3    States of America v. Franyerson Pujols Reynoso, 4:24-mj-196.

4    Will the parties please state your appearances?

5              MR. GANZ:  Morning, Your Honor.  John Ganz for the

6    United States.

7              THE COURT:  Good morning.

8              MR. DEGEURIN:  Michael DeGeurin from Mr. Reynoso.

9              THE COURT:  Good morning, Mr. DeGeurin.  I

10   understand --

11             MR. DEGEURIN:  And Mr. Reynoso is in custody and at

12   counsel table.

13             THE COURT:  Okay.  We are set for a preliminary and

14   detention hearing.  Are we going forward on both those

15   hearings?

16             MR. DEGEURIN:  Yes, your Honor.

17             THE COURT:  Okay.  Mr. Ganz, are you ready to

18   proceed?

19             MR. GANZ:  Yes, Your Honor.

20             THE COURT:  All right.  Please call your first

21   witness.

22             MR. GANZ:  Your Honor, if I may state at the outset,

23   the Government is moving to detain under two provisions,

24   3142(f)(1)(B), namely an offense for which the maximum sentence

25   is life in prison.  Defendant is charged with hostage taking,

1  which carries a maximum of life.

2          In addition, we -- on the alternative, we would move

3  under (f)2(A) and (B).  This is a case that involves a serious

4  risk that the person would flee, as well as a possible serious

5  risk that the person would obstruct or attempt to obstruct, or

6  threaten, injure, intimidate, or attempt to threaten, injure,

7  or intimidate a prospective witness or juror.

8          THE COURT:  I'm sorry.  Do you move under (f)(2)

9  based on that as well and as well as flight risk?

10         MR. GANZ:  Yes.

11         THE COURT:  Okay.

12         MR. DEGEURIN:  Is that -- is the understanding is

13  that raises a presumption, or is there --

14         THE COURT:  No.

15         MR. GANZ:  This is not a presumption case.

16         THE COURT:  It's not a presumption.  It's just under

17  (f)(1) and (f)(2).

18         MR. DEGEURIN:  Right.

19         MR. GANZ:  Okay.

20         MR. DEGEURIN:  I'm just making it a little clearer on

21  this.

22         MR. GANZ:  But also as well under (f)(1)(A),(B),

23  because this is an offense that involves a maximum sentence of

24  life imprisonment.

25         THE COURT:  Right.

1          MR. DEGEURIN:  I understand, but that doesn't raise

2    the presumption either.  It's just it's --

3          MR. GANZ:  The --

4          MR. DEGEURIN:  You're moving for flight and danger to

5    the community, basically.  And that's --

6          MR. GANZ:  Correct.

7          MR. DEGEURIN:  Right.

8          MR. GANZ:  Your Honor, at this time the United States

9    calls FBI Special Agent Patrick Lewis.

10          THE CLERK:  Raise your right hand, please.

11           PATRICK LEWIS, GOVERNMENT'S WITNESS, SWORN

12          THE CLERK:  Okay.  You may be seated.

13                      DIRECT EXAMINATION

14    BY MR. GANZ:

15    Q    Good morning, sir.

16    A    Morning.

17    Q    Please state your name.

18          THE INTERPRETER:  Hold on, hold on.

19          MR. GANZ:  I'm sorry.

20          THE INTERPRETER:  Excuse me.  Excuse me.  Sorry about

21    that.

22          MR. GANZ:  All set?

23          INTERPRETER:  Yeah, all set.

24          MR. GANZ:  Okay.  Thank you.

25          MR. DEGEURIN:  I guess that we should make the record

```
 1  clear that Mr. Reynoso is being -- having this interpreted to
 2  him in Spanish, and the delay was that the microphones weren't
 3  working, but he's now working -- he's hearing them interpreted.
 4           THE COURT:  Right.  And, Mr. Reynoso, if something
 5  happens, you don't understand what's going on, or you can't
 6  hear something, just tell your attorney and we'll stop and
 7  repeat.  Okay?
 8           THE DEFENDANT:  Yes, sir.
 9           THE COURT:  Proceed.
10           MR. GANZ:  And, Interpreter, if I ever speak too
11  fast, please have -- ask me to slow down.
12           THE INTERPRETER:  Thank you.
13  BY MR. GANZ:
14  Q    Please state your name.
15  A    Patrick Lewis.
16  Q    How are you employed?
17  A    I work for the Federal Bureau of Investigation.
18  Q    What is your title at the FBI?
19  A    Special Agent.
20  Q    What are your duties as a special agent?
21  A    I'm assigned to a violent crime squad, so I investigate
22  federal violent crimes as well as assist our state and local
23  partners with their state and local investigations.
24  Q    How long have you been an FBI agent?
25  A    Since 2019.
```

1   Q     And during the time of your career as an FBI agent, what

2   types of crimes have you investigated?

3   A     From 2019 to 2000 -- the beginning of 2024, I worked

4   violent crime in the Southern District of New York, in the New

5   York field office, on a Safe Streets task force.  And in

6   Houston, I'm assigned to a similar violation, which is violent

7   crime, investigating similar-type violations.

8   Q     Are you familiar with the facts of this case involving

9   this kidnapping that took place in Houston in early -- late

10  March, early April?

11  A     Yes, I am.

12  Q     Are you the lead case agent for this case?

13  A     Yes.

14  Q     When did this case, or how did this case come to the

15  attention of the FBI?

16  A     Initially, this case was reported by a woman who made a

17  walk-in complaint to the Harris County Sheriff's Office on

18  March 27th, 2024.

19  Q     What was her complaint?  What did she report?

20  A     She reported to them that her boyfriend had been

21  kidnapped.  And on the following day, March 28th, Harris County

22  Sheriff's Office requested the FBI's assistance in the

23  investigation.

24  Q     What did the woman tell Harris County, and then I guess

25  eventually FBI, as far as how she came to know of this

1   kidnapping?

2   A    She described that her boyfriend had left the Houston,

3   Texas area approximately on March 19th, 2024, to travel to

4   Michoacan, Mexico to visit his sick mother.  She spoke with him

5   over WhatsApp and confirmed that he had arrived in Michoacan,

6   Mexico.  And then on or about the 23rd of March, he had set to

7   return back to the United States.

8   Q    To be clear, was he going to enter the United States

9   legally or without -- or without inspection?

10  A    Illegally, without inspection.

11  Q    Okay.  What is his nationality?

12  A    He is Mexican.

13  Q    So his plan was to go -- why did -- why did he go to --

14  you said he went to Mexico to visit his sick mother?

15  A    Correct.

16  Q    Then he was there to return surreptitiously to the United

17  States?

18  A    Correct.

19  Q    What was the next thing that happened?

20  A    On the early morning hours of March 25th, the girlfriend

21  received the last text communication, which she believed was

22  her boyfriend, in which he stated that he had made it to San

23  Antonio, Texas.  That same day in the evening, at approximately

24  7:11 p.m., she received a phone call from an unknown telephone

25  number, ending in 6868, in which an unknown person told her her

1    boyfriend had been kidnapped, and if she notified police, he

2    would be killed, and they also knew her identity and where she

3    was, and they would come for her if she notified police.

4    Q    So they said they knew her address, and if she reported to

5    law enforcement, they'd come after her?

6    A    Correct.

7    Q    Okay.  What was her next step, or what was the next step?

8    A    Shortly after that phone call, at 7:14 p.m., she received

9    a photograph via text message that depicted a person she

10   recognized to be her boyfriend lying face down with his arms

11   bound behind his back and five firearms being pointed at him.

12   Q    Special Agent, do you have Exhibit 1 at your desk there?

13   A    Yes.

14   Q    Do you recognize Exhibit 1?

15   A    Yes, I do.

16   Q    What is Exhibit 1?

17   A    Exhibit 1 is a picture of a cell phone text thread that

18   also contains a picture in the text thread.

19   Q    And what is that?  Is that the picture that you just

20   described?

21   A    Yes, this is the picture that the girlfriend showed me

22   while I interviewed her.

23   Q    Does this fairly and accurately -- does this exhibit

24   fairly and accurately portray the text photo as you were -- as

25   it was provided to you by the girlfriend?

1  A     Yes.

2          MR. GANZ:  Your Honor, at this time I'd move to --

3  move into evidence Government's Exhibit 1.

4          MR. DEGEURIN:  For the purposes of this hearing, I

5  don't have a problem with it.  The authenticity and things like

6  that, like who took the photo, for this purposes, I'm not going

7  to object to it, but only for the hearing.

8          THE COURT:  So noted, and it will admitted for

9  purpose of this hearing only.

10         (Government's Exhibit 1 admitted into evidence)

11 BY MR. GANZ:

12 Q    With this photo admitted, you said this was -- this was

13 the -- this was the photo that was -- that was indicating that

14 her boyfriend had been taken hostage.

15 A     Correct.

16 Q    Okay.  What was the next step?

17 A     The girlfriend advised us that she had spoken to -- she

18 called her boyfriend, who will I think be easiest to refer to

19 as Victim 1.  Victim 1's sister, who lives out of town, she

20 called her and notified her of the phone call she received.

21 And it was at that time she learned that Victim 1's sister had

22 also received a phone call from the 6868 telephone number.

23 Q    Okay.  What was the sum and substance of that phone call

24 that the sister had received on the 6868 call?

25 A     The FBI conducted an interview of Victim Number 1's sister

1   as well, and she provided that on the same date, March 25th,

2   she received a phone call from the 6868 number, in which an

3   individual told her and her husband on the phone call that her

4   brother had been kidnapped and they wanted $15,000 in ransom

5   money or he would be killed -- $15,000 for his safe return.

6   Q    Okay.  What was the next thing that happened in terms of

7   the victim's reporting?

8   A    On March 26th, so the next day, the Victim Number 1's

9   sister received a text message that had three names and

10  telephone numbers that were Zelle account identifiers, and

11  these were the Zelle accounts that the ransom payments were to

12  be made to.

13  Q    To be clear, did the hostage taker say, we want payments

14  through Zelle?

15  A    Yes.

16  Q    And then this -- and then do you have Exhibit 2 at your

17  desk there?

18  A    Yes, I do.

19  Q    Do you recognize Exhibit 2?

20  A    Yes.

21  Q    What is Exhibit 2?

22  A    This is a picture of the text threads that Victim

23  Number 1's sister received depicting the Zelle account

24  identifier information the payments were to be made to.

25  Q    Does this fairly and accurately portray the text message

1   as the -- as the victim -- as it was presented to the FBI?

2   A    Yes.

3          MR. GANZ:  Your Honor, at this time, I move you admit

4   Government's Exhibit 2.

5          MR. DEGEURIN:  I'll make the same objection, but not

6   objecting to it being admitted for the purpose of this hearing.

7          THE COURT:  Admitted for the purpose of this hearing.

8        (Government's Exhibit 2 admitted into evidence)

9          MR. GANZ:  Thank you, Your Honor.

10  BY MR. GANZ:

11  Q    Special Agent, how many names and numbers are listed on

12  this text message?

13  A    There's three telephone numbers and three names.

14  Q    What is the first name and telephone number?

15  A    The first telephone number is 717-980-1629, and the name

16  associated with that is Franyerson Pujols.

17  Q    Were you able to link that phone number to this defendant?

18  A    Yes.

19  Q    Let's talk about that a little bit later, but we'll sort

20  of set the stage for that.  So at this point now, the family

21  has received a ransom demand and also a mechanism through which

22  they want it paid.  What was the next thing that happened?

23  A    So the family initially made two payments of approximately

24  $2,000 apiece through Zelle, totaling about $4,000.  As of

25  April 2nd, 2024, Victim Number 1's family had paid

1   approximately $6,035 --

2   Q    Okay.

3   A    -- in total ransom payments.

4   Q    Okay.  What was the next step in the investigation?

5   A    The FBI also conducted an interview of Victim Number 1's

6   girlfriend's roommate.  And during that interview, she told the

7   FBI that once this ordeal began, she received a phone call from

8   a person who reported to be a family member of another person

9   being held hostage with Victim Number 1.  This person provided

10  her the phone number that contacted them, which ended in 9472.

11  Q    Okay.

12  A    The roommate then called the 9472 number and spoke with an

13  unknown male on that phone.  And in sum and substance, that

14  person told her that he was a cop and to just pay the money or

15  their family member would be killed.  She recorded a part of

16  that conversation, which was in Spanish.  And once translated,

17  it translated to, "They're not going to kill him.  They're just

18  beating him, but they're not going to kill him."

19  Q    And was that referring to the other victim or the Victim

20  Number 1?

21  A    Victim Number 1.

22  Q    Okay.  What was the next thing that happened?

23  A    The FBI identified the house located at 4309 Harby

24  Street  --

25  Q    Okay.

```
 1  A    -- as a house that the 6868 telephone number was being

 2  utilized at.

 3  Q    Were plans made for a rescue?

 4  A    Yes.  So the FBI contacted the owner at 4309 Harby Street.

 5  And it was at that time that he advised that property is

 6  utilized as a short-term rental property.

 7  Q    Sort of like an Airbnb?

 8  A    Correct, through Airbnb and Booking.com.

 9  Q    Okay.  What did he -- what if anything of significance did

10  the owner tell you about any reservations for the house at that

11  time?

12  A    So he advised that the current occupants of the house

13  began their stay on March 31st, 2024.  And that house was

14  equipped with exterior Nest surveillance cameras.  And he

15  provided the FBI with the video clip of when the residents

16  arrived on March 31st at approximately 11:35 a.m.

17  Q    Did he say anything that caught your attention with regard

18  to any requests that the renters had made of him?

19  A    Yes.  The renters requested that on March 31st the

20  cleaning service that was scheduled for that day be canceled

21  and that they got an early -- get an early check-in into the

22  residence.

23  Q    Okay.  He provides you then Nest footage or I guess access

24  to the Nest footage.  What if -- did you -- did the FBI review

25  that?
```

```
1   A     Yes.  So --

2   Q     What if anything of significance did you find from that

3   footage?

4   A     So on March 31st at 11:35 a.m. the video of the front of

5   the house depicts a beige or tan SUV back into the driveway

6   followed closely by a dark-colored sedan.  It's either parked

7   on the street or the driveway.  Shortly after, 13 individuals

8   exit the SUV and the vehicle and enter the residence.

9   Q     Did you recognize any individuals who came in?

10  A     Yes, one of the individuals that entered the house at 4309

11  Harby Street was positively identified as Victim Number 1, and

12  based on the video footage did not appear free to leave or

13  acting under his own will.

14  Q     What was the next step?

15  A     The FBI obtained a search warrant for 4309 Harby Street.

16  Q     Okay.  Did they execute the warrant?

17  A     Yes.  That warrant was executed in the early morning hours

18  of April 3rd, 2024, at approximately 2:18 a.m.

19  Q     What were the results of that search warrant execution?

20  A     The -- one of the defendants was called out from the front

21  door of the residence and arrested, and a second defendant was

22  located in the back laundry room area of the residence and

23  arrested.

24  Q     The one who was called out, what was his name?

25  A     His name was Kevin Marcano.
```

```
 1  Q    Was he ever -- so there were two individuals.  How many
 2  people were found at the house?
 3  A    Two people were arrested from the house and four hostages
 4  were rescued from the house.
 5  Q    So four people who were later identified as hostages.
 6  A    That's correct.
 7  Q    Okay.  And that included Victim Number 1?
 8  A    Yes.
 9  Q    And then two other individuals were arrested.  You said
10  one was called out.
11  A    Correct.
12  Q    And what was that person's name?
13  A    Kevin Marcano was called out from the front of the
14  residence, and the second person that was arrested was named
15  Elloy Pedraza.  And he was observed in the back laundry room
16  and then called out and arrested from the residence.
17  Q    Was Marcano identified by the hostages as a kidnapper --
18  as a hostage taker?
19  A    Yes, he was.
20  Q    And has he been indicted in Case Number 4-cr --
21  4:24-cr-225?
22  A    Yes, he is.
23  Q    Was Pedraza -- I believe was the second person?
24  A    Yes.
25  Q    Was he identified by the hostages again as a hostage
```

1  taker?

2  A    Yes, he was.

3  Q    And has he been indicted in that 225 case?

4  A    Yes.

5  Q    Okay.  What did -- let's break down.  Did you debrief the

6  hostages?  Oh, first of all, let's take a step back.  What if

7  anything was found?  Was the house searched?

8  A    Yeah, so I probably should have said this earlier, but the

9  search warrant was executed by the FBI Hostage Rescue Team, or

10  HRT, who traveled down from Quantico to execute the warrants.

11  Following their initial clear of the residence during a walk-

12  through, they advised the case team that a firearm with -- a

13  black firearm with a lower red either magazine or handle

14  portion was located between the dryer and bathroom wall in the

15  laundry room.

16  Q    Did you find any connection between that firearm and any

17  of the firearms depicted in Government's Exhibit 1?

18  A    Yes, it appears to be one of the firearms that is

19  photographed in Government Exhibit 1.

20  Q    Okay.  So they found this one firearm.  Did they find any

21  other firearms?

22  A    Yes, in the second bathroom in the house, which is off of

23  a secondary hallway, a firearm was located in the bathtub.

24  Q    Was anything else found of interest?

25  A    Yes, there's -- approximately $13,000 worth of cash was

1  located in that residence as well as multiple cell phone

2  devices.

3  Q    Was there any indication that someone may have gotten

4  away?

5  A    Yes.  During the walk-through HRT advised that in the rear

6  back bedroom there was a broken window that they did not break

7  during the execution of the warrant which indicated to them

8  that there was a possibility somebody escaped from the

9  residence while the warrant was being executed

10 Q    Did the name Citlali Martinez-Morales come up?

11 A    Yes.

12 Q    How so?

13 A    On April 4th, 2024, Citlali Martinez-Morales --

14 Q    Well, let me take a step back.  Any other items in the

15 house?

16 A    Once the scene was secure in the house, agents placed a

17 phone call to the 6868 number.  And at that time, a phone in

18 the rear back bedroom, the same bedroom where the window was

19 broken out, began to ring indicating that that was -- it showed

20 the incoming call confirming that that was the number that

21 was -- or the device that was utilizing the 6868 number.

22 Q    Okay.  Were any purses, identifying -- any identifying

23 documents or things like that found in the house?

24 A    Yes.  In that same room, there was a handbag that also

25 contained Ms. Martinez-Morales' ID and passport and other

1  documentation.

2  Q    We're going to talk a little bit about how she connects to

3  this defendant.  Has she been indicted in that 225 case?

4  A    Yes, she has.

5  Q    All right.  The raid's been executed, four hostages

6  rescued, and two people arrested.  Was anyone else arrested

7  that night?

8  A    Yes.  So at approximately 1:30 a.m. on April 3rd, so prior

9  to the execution of the warrant, two males were seen exiting

10  the residence, entering a dark Mercedes in the driveway, and

11  driving away from the residence.  Surveillance followed them to

12  a strip club north of Houston where both the male individuals

13  exited the vehicle and entered the strip club.

14  Q    Okay.  Was that -- was that car eventually stopped?

15  A    Yes.  At approximately 3 a.m., the two individuals exited

16  the strip club, got back into the vehicle, and at that time,

17  the Harris County Sheriff's Office conducted a stop of the

18  vehicle, and both individuals were arrested.

19  Q    Was anything -- was the car searched?

20  A    Yes, it was.

21  Q    Anything found in the car?

22  A    Yes.  On the front passenger floorboard, a firearm was

23  found, and under the front passenger seat, a second firearm was

24  also found.

25  Q    Okay.  What were the names of those individuals?

1  A    Gerson Alfaro was the driver of that vehicle, and Luis

2  Montilla was the front passenger.

3  Q    Have they been indicted in the 225 case?

4  A    Yes, they have.

5  Q    Okay.  We now have the scene secure.  We have the hostages

6  safe.  Did you debrief the hostages?

7  A    Yes, we conducted interviews with all of the hostages.

8  Q    What did Victim 1 say?

9  A    Victim 1 --

10  Q    Sorry.  What did Victim 1 describe -- how did Victim 1

11  describe the ordeal?

12  A    So Victim 1 detailed his travel to Michoacan, Mexico to

13  visit his sick mother, and then his return travel to the United

14  States.  He described crossing into the United States illegally

15  and then traveling with the other hostages he was rescued with

16  through the brush for two nights and spending another night in

17  the brush.  And at the third night, a white- or light-colored

18  sedan came and picked them up.  All of the hostages got into

19  the back of that vehicle willingly.  That vehicle was occupied

20  by a front driver -- male driver, and a front male passenger,

21  and the hostages believed that vehicle to be part of their

22  prearranged travel into the United States.

23      Once that vehicle began traveling, at some point during

24  the trip, the front male passenger drew -- produced a handgun,

25  pointed it at the hostages, and demanded their cell phones,

1   which they turned over.  The hostages were then taken to a

2   residence where they were stripped of their clothing, forced to

3   shower, and then forced to get contacts out of their cell

4   phones for their family members and then subsequently make

5   ransom phone calls to their family members demanding $15,000.

6   Q    Okay.  Did they mention any mistreatment?  Obviously, at

7   this point, they're being held against their will.  Are they

8   being mistreated in other ways?

9   A    Yes, they --

10  Q    Did Victim 1 describe being mistreated in other ways?

11  A    In particular, Victim Number 1 described being beaten,

12  assaulted, assaulted with shoes.  He described being zip-tied,

13  tied up, and left on his stomach on the ground for multiple

14  hours, and on multiple occasions having firearms pointed at him

15  and his life being threatened on multiple occasions.

16  Q    Did he take those threats seriously?

17  A    Yes, he did.

18  Q    Did he think about escape?

19  A    He told me that he believed if he attempted escape, he

20  would be killed.

21  Q    Did he identify this defendant?

22  A    Yes, he did.

23  Q    How, in terms of -- tell me what -- how did you present

24  this defendant to him and what did he say about him?

25  A    This -- the defendant's photograph was presented to Victim

```
 1  Number 1, and Victim Number 1 explained that he was one of the
 2  kidnappers.  He pointed a gun at Victim Number 1, and he went
 3  by the nickname Flaco (phonetic 11:04:38).
 4  Q    Okay.  To be clear, and not to state the obvious, but
 5  pointed a gun at him why?  To keep him there?
 6  A    Correct.
 7  Q    Okay.  Did the hostages describe -- was -- does this all
 8  go down at 4309 Harby Street, or were there other locations to
 9  which they were taken?
10  A    No, they described being transported to approximately four
11  different residences during this ordeal, staying for different
12  amounts of time at each location.
13  Q    Where did he place Mr. Reynoso, at just 4309 or at other
14  houses?
15  A    No, at all the houses that -- throughout this ordeal.
16  Q    So the --
17          THE COURT:  Wait, I'm sorry.  Where did who place?
18  BY MR. GANZ:
19  Q    Did Victim 1 place Defendant Reynoso at just the 4309
20  Harby Street, or at these other -- I believe you said a total
21  of four locations?
22  A    He placed them at the previous addresses as well as the
23  4309 Harby address.
24  Q    So according to Victim 1, Mr. Reynoso was part of this
25  from the start?
```

```
1   A    Correct.

2   Q    Okay.  And he said Mr. Reynoso was armed with a gun?

3   A    Correct.

4   Q    And he pointed a gun at him?

5   A    Yes.

6   Q    Okay.  And you said that he thought that if he tried to

7   escape, he'd be killed?

8   A    Correct.

9   Q    Okay.  Let's shift to -- just one second.  And I don't

10  know if I asked you this, but he identified himself -- did you

11  show him Exhibit 1?

12  A    I showed Victim Number 1 Exhibit 1, yes.

13  Q    Did he identify himself in that?

14  A    Yes, he identified that that was him, and as the picture

15  depicts, he was tied up, placed on his stomach, had firearms

16  pointed at him, and left for multiple hours in that position.

17  Q    Okay.  Let's shift to Victim 2.  What did Victim 2 tell

18  you in terms of his ordeal?

19  A    So Victim 2 detailed a similar story of traveling to the

20  United States by illegal means, being picked up by a car in the

21  middle of the night, having his cell phone taken from him,

22  being taken to a house where he was stripped of his clothing,

23  assaulted, forced to get his family members' contact

24  information from his phone, and make ransom phone calls to his

25  family members.
```

1  Q    Did Victim 2 say anything about whether his family had

2  actually paid the ransom?

3  A    Yes, Victim 2 said that his father had paid the full

4  $15,000 ransom request.

5  Q    Was Victim 2 released even after this $15,000 was paid?

6  A    No, he was not.

7  Q    Did Victim 2 connect Defendant Reynoso to this crime?

8  A    Yes.

9  Q    How so?

10  A    He said he was one of the kidnappers that was there

11  throughout this ordeal and also went by the nickname Flaco.

12  Q    Okay.  I believe your affidavit makes reference to Reynoso

13  guard -- as Victim 2 saying that Reynoso guarded him?

14  A    Correct.

15  Q    Okay.  Victim 1 said that if he tried to run, he thought

16  he'd be killed.

17  A    Yes.

18  Q    Did Victim 2 make any remarks to that effect?

19  A    Yes, he reiterated that feeling that if he tried to

20  escape, he would be killed.

21  Q    Let's shift to Victim 3.  What did Victim 3 tell you about

22  his ordeal?

23  A    So Victim 3 told us similar stories to Victim 1 and 2

24  regarding travel to the United States, having his cell phone

25  taken, being forced to make ransom phone calls to his family,

1  and being threatened with firearms on multiple occasions.

2  Q    Okay.  Shifting back quickly to Victim 2, did Victim 2

3  ever report being beaten?

4  A    Yes, he did.

5  Q    How was he beaten?

6  A    On one particular occasion, he described being on the

7  phone with his dad and being smacked across the face because

8  the kidnappers believed his dad had given their contact

9  information to somebody.

10 Q    Did Victim 3 ever talk about being beaten?

11 A    Victim 3 did report being assaulted, yes.

12 Q    Okay.  Did Victim 3 connect Defendant Reynoso to the

13 crime?

14 A    Yes, he did.

15 Q    How so?

16 A    He said that he was one of the kidnappers.  He did not --

17 Mr. Reynoso did not assault Victim 3.  However, he spoke with

18 him and said this is just a job, and he felt bad for the

19 hostages.

20 Q    Did Victim 3 say whether or not Mr. Reynoso carried a gun

21 during the crime?

22 A    Yes, he did say he was armed with a gun.

23 Q    Okay.  Did Victim 3 say anything about whether Mr. Reynoso

24 prevented any of the victims from fleeing?

25 A    Yes, he said that he provided security and prevented the

```
 1  victims from fleeing the residence.
 2  Q    Let's talk about Victim 4.  What did Victim 4 tell you?
 3  A    Similar story to Victims 1, 2, and 3 regarding his travel
 4  to the United States, having his cell phone taken from him,
 5  being assaulted, forced to get his family members' telephone
 6  numbers from his phone and make ransom phone calls to his
 7  family.
 8  Q    Did Victim 4 connect Reynoso to the event?
 9  A    Yes, he did.
10  Q    How so?
11  A    He identified Mr. Reynoso as being one of the kidnappers.
12  Q    Okay.  Did he say whether or not Mr. Reynoso was armed
13  during the period of his confinement?
14  A    Yes, he did.
15  Q    Okay.  With what?
16  A    A firearm.
17  Q    Okay.  We talked about how the search of the house had
18  turned up, was it a bag and other items that identified an
19  individual named as Citlali Martinez-Morales?
20  A    Correct.  Personal property belonging to her.
21  Q    So again, recap for me, what was that personal property?
22  A    It was a number of items, but in particular, a passport
23  and other physical ID belonging to Ms. Martinez-Morales.
24  Q    Did you have any contact with Ms. Morales -- Martinez-
25  Morales after the raid?
```

```
 1  A    Yes.  On April 4th, she called the FBI field office here

 2  in Houston and advised she was at a party at 4309 Harby Street

 3  on March 31st.  At that time, she got intoxicated.  She left

 4  the residence and left her property at the house.  She had seen

 5  on the news that the FBI conducted a raid at 4309 Harby Street,

 6  and she was inquiring as to how to get her property back.

 7  Q    Did she -- what was your next step?

 8  A    I spoke with her on the phone.  It was at that time she

 9  told me she had work obligations the rest of that week and the

10  following weekend, and she would contact me the following week

11  to schedule a time that she could come and collect her

12  property.

13  Q    Did she in fact --

14            THE COURT:  (Indiscernible).  Sorry to interrupt.  So

15  this is a woman that you contacted based on property found at

16  the residence?

17            THE WITNESS:  Your Honor, she actually contacted the

18  FBI and reported that her property was in the --

19            THE COURT:  But you found -- identified the property

20  at the residence?

21            THE WITNESS:  That's correct.

22            THE COURT:  This was just how -- I don't know if

23  you've gotten there yet, but how does she tie into what's

24  happened?

25            MR. GANZ:  We're about to get there.
```

```
 1              THE COURT:  Okay.

 2              MR. GANZ:  All right.

 3              THE WITNESS:  Yeah.

 4   BY MR. GANZ:

 5   Q    Did you speak to Victim 1 about Ms. Martinez-Morales?

 6   A    Yes.

 7   Q    Did he connect her to the crime?

 8   A    Yes.  He said that she was one of the kidnappers that

 9   provided security on the hostages, and she went by the nickname

10   Lily (phonetic).

11   Q    Did he mention whether she was armed?

12   A    Yes, she was.

13   Q    Okay.  Did he mention about any instructions she may have

14   received when other hostage takers were out?

15   A    Yes.  He detailed that it was her job to watch the

16   hostages when the other kidnappers were not there, and he

17   overheard them instruct her that if they tried to run, to kill

18   them.

19   Q    Did Victim 2 mention Ms. Morales at all?

20   A    Yes, he did.

21   Q    How did -- did he connect her to the crime?  And if so,

22   how?

23   A    Yes, he stated that she was one of the kidnappers as well.

24   She went by the nickname Lily or Lali (phonetic).

25   Q    Did he mention her being armed?
```

```
 1  A    Yes.

 2  Q    With?

 3  A    A gun.

 4  Q    Okay.  What about Victim 3?

 5  A    He did --

 6  Q    Okay.  Actually, Victim 3 did not.

 7  A    Yeah, correct.

 8  Q    What about Victim 4?

 9  A    Victim 4 positively identified her as being one of the

10  kidnappers, and he thought she went by the nickname Dolly

11  (phonetic).

12  Q    Okay.  So, we have three of the four victims

13  identifying  -- we have Martinez-Morales' personal items at the

14  house.  And again, where was that found?

15  A    4309 Harby Street in the back bedroom, where the broken

16  window was, as well as the telephone that was assigned the

17  6868 telephone number.

18  Q    And then we have three victims identifying her as part of

19  the conspiracy.

20  A    That's correct.

21  Q    She calls you.  She says, I want to come pick up my stuff.

22  Did she ever come in?

23  A    Yes.  On April 22nd, 2024, at approximately 3:05, she came

24  to the FBI office to collect her property.  And it was at that

25  time that the FBI conducted an interview of
```

1  Ms. Martinez-Morales.

2  Q    Did you mirandize her?

3  A    Initially, no.  We brought her into our victim interview

4  room and kind of asked her to describe some of her property

5  that she had and just asked her some questions like any

6  observations she had while she was at the house.  And she

7  didn't really provide us any of the facts that we knew were

8  true and things that were going on in the house.  Following

9  that, I mirandized her.

10 Q    Did she waive Miranda?

11 A    Yes, she did.

12 Q    Okay.

13 A    And then, ultimately, she admitted to knowing people were

14 being held against their will, helping to facilitate ransom

15 phone calls, knowing there were multiple people in the house

16 that were armed, witnessing the hostages being assaulted, as

17 walking -- being with the hostages and the other kidnappers at

18 multiple Airbnbs, witnessing the photograph of Victim Number 1

19 being taken where he is bound on the ground with guns pointed

20 at his head, and also participating in the stripping down of

21 the hostages' clothes and removing their clothing.

22 Q    Did she connect Mr. Reynoso to the event?

23 A    Yes, she did.

24 Q    How so?

25 A    She positively identified a picture of Mr. Reynoso from

1  the Nest video camera at 4309 Harby Street as a person that she

2  knew by the name Flaco.  And she also positively identified

3  Mr. Reynoso's Pennsylvania DMV photo as being the same person

4  she knew as Flaco.

5  Q    Did she describe Flaco's involvement in the crime?

6  A    Yes.  She --

7  Q    What was that involvement?  That he was one of the

8  kidnappers that was there throughout the duration.  She also

9  said that he was at the house, 4309 Harby Street, on the night

10  that the FBI came to the house to execute the search warrant.

11  And it was with --

12  Q    Just take a step back.  When the FBI arrives on scene,

13  they knock on the door.  Did they call out from outside?  How

14  did that get executed?

15  A    So they -- it was the Hostage Rescue Team that executed

16  the search warrant, but they utilized armored vehicles, pulled

17  up into the front yard with the lights on and over a megaphone

18  issued verbal instructions for the occupants inside the house

19  to come out and submit to law enforcement.

20  Q    So they're essentially saying this is the FBI, come out of

21  the house?

22  A    That's correct.

23  Q    Did she report hearing that?

24  A    Yes.

25  Q    And in response to hearing that, what did she do?

1  A    She reported that herself and Mr. Reynoso broke out and

2  jumped out the back window, ran or -- ran or walked on foot for

3  a undisclosed distance before calling an Uber and taking the

4  Uber away from the location.

5  Q    Did she have any phones with her when she came to the FBI?

6  A    Yes, she did.

7  Q    And were there any phones in the house that were covered

8  that she was -- that said she was connected to?

9  A    Yes.  So I -- during the interview, I showed her the cell

10 phone device assigned the 6868 number, and she confirmed that

11 that phone belonged to her and confirmed where she left it in

12 the house.

13 Q    What about any other phones?

14 A    She also brought a phone with her to the FBI office on the

15 day she was interviewed.  Initially, she said that was the

16 phone she had with her on March 31st at the house.  But

17 eventually she said that that was a new cell phone that she had

18 acquired after the search warrant.

19 Q    Did she give consent to search either of those two phones?

20 A    She signed consent to search both of those devices.

21 Q    Did you search those phones?

22 A    Yes.

23 Q    Did you find anything relating to Mr. Reynoso in either

24 phone?

25 A    Yes.  In the contacts of both of those phones, there's a

1   contact by the name of Flaco, and the telephone number assigned

2   to that contact ends in 1629, the same --

3   Q    The same number?  Is that the same number in the

4   Government's Exhibit 2?

5   A    Yes.  717-980-1629.

6   Q    Okay.  Did you do anything to investigate the 1629 number?

7   A    Yes.  On April 12th, the FBI obtained a search warrant for

8   historical GPS data for the 1629 number.

9   Q    Okay.  What, if anything, did that -- did you get a

10  response back from the phone company?

11  A    Yes, we did.

12  Q    And what, if anything of significance, did that response

13  contain?

14  A    It showed that the GPS coordinates for that cell phone

15  device was in the area of 4309 Harby Street on March 31st,

16  April 1st, April 2nd, and the morning of April 3rd.  And then

17  shortly after the next day, that phone began to travel from the

18  Houston, Texas area up into the Harrisburg, PA area --

19  Pennsylvania.

20  Q    Did you obtain prospective location data for that phone

21  number?

22  A    Yes, we did.

23  Q    Where did -- where did it go to?

24  A    Harrisburg, Pennsylvania.

25  Q    Does -- to the best of your knowledge, based on your

```
 1   investigation, does Mr. Reynoso have any connection to

 2   Harrisburg, Pennsylvania?

 3   A    Yes, to my knowledge, that's -- he has family that lives

 4   in that area, and he is from that area.

 5   Q    Okay.  Did you obtain an arrest warrant for him?

 6   A    Yes, I did.

 7   Q    And where was he arrested?

 8   A    Harrisburg, Pennsylvania, by the Harrisburg Police

 9   Department.

10   Q    Let's talk about the Zelle payments.  In total, of all the

11   victims' families, anyone associated to that in connection with

12   this incident, do you have a sense of how much was paid in

13   ransom money?

14   A    So, yes --

15   Q    Globally.

16   A    -- just from what the victims had reported to us, and

17   there's been numerous forms of payment to include cash drops,

18   Zelle, money transfers via Western Union.  But in total, it's

19   somewhere in the area of $65,000 to $70,000 was transferred

20   total by the victims' families.

21   Q    Mr. Reynoso's phone number and name is on that Zelle text

22   in Government's Exhibit 2.  Did you obtain records from Zelle?

23   A    Yes, I did.

24   Q    Did you see any transactions going to that number or any

25   number connected to Mr. Reynoso?
```

```
 1   A     Yes.

 2   Q     Please explain.

 3   A     There's a number of transactions going to Mr. Reynoso's

 4   Zelle account.  In --

 5   Q     And does this have his name on it?

 6   A     Yes.

 7   Q     Okay.  So a Zelle account with that name and that phone

 8   number is there?

 9   A     Yes.

10   Q     What transaction activity did you see and what time period

11   did that take place?

12   A     So the time period is around the time that this incident

13   took place that was described by the hostages, but there's a

14   number of transactions in which Mr. Reynoso is listed as the

15   recipient, and he's receiving money from Sergio Rojina

16   (phonetic) and Shariah Santana Perez (phonetic), as well as on

17   at least one occasion, he's the recipient on a payment from one

18   of the victim's families directly.

19   Q     Okay.  So he's getting payments from victims, but also

20   payments from the other two individuals listed on Government's

21   Exhibit 2?

22   A     Correct.

23   Q     Did all the transactions go through or was there a mix

24   of  --?

25   A     It was a mix of -- there's a column that indicates denied
```

1  or -- I don't remember what the other word they use, but it

2  indicates that some would not go through and some would, and

3  some of the transactions are of a total of, you know, $1, which

4  would indicate it's possibly a test to see if the transaction

5  will go through, you know, very small amounts, but then there's

6  others that are significant amounts of money.

7  Q    I know you -- did you -- when did you get these -- when

8  did you get these records?

9  A    Very recently, within the last couple days.

10  Q    So you've done some review of them?

11  A    Correct.

12  Q    With that limited, let's call it a cursory view, do you

13  have a sense of how much money Mr. Reynoso received?

14  A    Yeah, just a real -- not really diving deep into it, it

15  appeared to be somewhere between 1,000, $2,000 just on the --

16  for that time period --

17  Q    Okay.

18  A    -- through Zelle, of course.  That's the only records I'm

19  referring to.

20          MR. GANZ:  May I have a moment, Your Honor?

21          THE COURT:  Yes.

22          MR. GANZ:  Thank you.

23  BY MR. GANZ:

24  Q    So it's fair to say that this hostage taking was a group

25  effort, correct?

```
 1   A     Correct.

 2   Q     And according to the hostages, Mr. Reynoso was there for

 3   the duration.

 4   A     That's correct.

 5               MR. GANZ:  Pass the witness.

 6               THE COURT:  Cross?

 7               MR. DEGEURIN:  Yes, Your Honor.

 8                         CROSS-EXAMINATION

 9   BY MR. DEGEURIN:

10   Q     Agent Louis -- is it Louis?

11   A     Yes, sir.

12   Q     Before we started this hearing, the U.S. Attorney handed

13   me some reports.  And I believe that the reports are by you.

14   Do you have a copy of them there?

15   A     I think I have one that is a --

16               MR. DEGEURIN:  May I approach?

17               THE COURT:  Yes.

18               THE WITNESS:  I have a 302.

19               MR. DEGEURIN:  Let me just show you what I have.

20               THE WITNESS:  Okay.  Sure.

21               MR. DEGEURIN:  And then -- and see if you have

22   because (indiscernible).

23               THE COURT:  Just for the record, you don't have to

24   ask again to inquire.

25               THE WITNESS:  Sure.  So I do appear to have Victim 2.
```

```
 1  It's a combination report, sir.

 2          MR. DEGEURIN:  (Indiscernible) off the record for one

 3  moment.

 4          THE COURT:  Sure.

 5          THE WITNESS:  Okay.  Yeah, I see it's a combination

 6  here.  So I have Victim 2, Victim 3.  Gotcha.  Yep.

 7          MR. DEGEURIN:  Do you have them all?

 8          THE WITNESS:  Let me just confirm.  Okay, great.

 9  Yeah.  Yeah.

10          MR. DEGEURIN:  All right.  Back on the record.

11  BY MR. DEGEURIN:

12  Q    So, Agent, you do have a copy of the -- these reports that

13  are I guess 302s?

14  A    Yes.

15  Q    And they involve the different victims that you testified

16  earlier today.

17  A    Correct.

18  Q    To keep accord with my agreement with the Government, I'll

19  just refer to them as Victim 1, Victim 2, as to not reveal any

20  identities.

21  A    Sure.

22  Q    The identities are revealed in the reports, but we'll just

23  call Victim 1, Victim 2.

24  A    Sure.

25  Q    Now, through -- when -- were you present for all the
```

1  interrogations?

2  A    So, no, I was -- I was present for all of the victim

3  interviews that you have here, as well as the interview of

4  Ms. Martinez-Morales.  But there were other interviews that

5  have occurred in the course of this investigation that I have

6  not been present for.

7  Q    But for the four different people that we talked about

8  today, the four victims, you were present?

9  A    Yes, I was.

10 Q    Do you speak Spanish?

11 A    I do not.

12 Q    So the interviews were translated to you into -- from

13 Spanish to English.

14 A    Correct.  We utilized a language specialist for all of the

15 interviews.

16 Q    Were there any of these potential victims that were --

17 that spoke English?

18 A    Some of them spoke a small combination of English, but

19 primarily the interviews were conducted with the victim

20 speaking Spanish.

21 Q    Have you become familiar what the term Flaco means?

22 A    I think it means skinny.

23 Q    Right.

24 A    Yeah.

25 Q    It's a very common -- I mean, I understand you're from New

1  York, but down here, closer to the border, we hear -- Flaco

2  means skinny, right?

3  A    Yeah.

4  Q    It's a very common nickname.  Are you -- have you become

5  aware of that?

6  A    Yes.

7  Q    Now, during your interviews, and during -- in your 302s,

8  you show a number of photographs to the victims, and you list

9  them by number, Photograph 1, Photograph 2, all throughout.

10  And each of the victims were shown photographs identified as 1,

11  2, 3, 4.  Are those numbers consistent?  So if you were showing

12  Photograph Number 1 to one victim, that's going to be the same

13  Photograph Number 1 to the other victim?

14  A    Victims 2, 3, and 4, they are consistent.  Victim 1 is

15  not.  That was the first interview we did, and we had some

16  technical difficulties during the interview in which we had to

17  stop it and restart.  So the numbers are not consistent with

18  Victim Number 1.  However, the digital attachments that are

19  associated with these 302s, which contain the photographs

20  shown, are consistent in their numbering with the -- what was

21  shown to that victim.

22  Q    So -- and I know this is hard for the Court to see, but

23  I've read it, the prosecutor has read it, but the Court hasn't

24  read these.  There are a series of photographs that are

25  presented to these victims, up to about 16 or 17 photographs,

```
 1  right?

 2  A    Correct.

 3  Q    And I assume these photographs are coming from either the

 4  zest -- the Nest photos, and other ways that you've been able

 5  to find -- identify people.

 6  A    Correct.

 7  Q    Somewhat consistently through the victims, it's Photograph

 8  Number 14 that is identified as Flaco.

 9  A    Yes.

10  Q    Now, like you said, Victim Number 1 was not shown a

11  picture in this where -- and wasn't shown Picture Number 14.

12  Is that correct?

13  A    He was shown the same photograph, but the number of the

14  photograph during that interview was not Number 14, it was

15  Number 10 that was shown to him.

16  Q    Okay.  So -- but you're clear that who Number -- Victim

17  Number 1 is identifying as Flaco -- he actually gave you some

18  description of who he said Flaco was, right?

19  A    Yes.

20  Q    Skinny, of course, nicknamed Flaco, unless it's ironic,

21  they called me Flaco.

22  A    Yes, he did.

23  Q    Okay.  So -- but he gave a very specific description of

24  Flaco, also as having a neck tattoo.

25  A    I don't recall that, but that's -- I don't see that under
```

1   the photograph.

2   Q    It's on Page 3.  Bottom of the page of Page 3.

3   A    Yes, I see that.

4   Q    Okay.  And Mr. Reynoso does not have a skull tattoo on his

5   neck, does he?

6   A    He does not.

7   Q    Okay.  So there's at least some issue that a person that

8   the Victim Number 1 is saying is Flaco is misidentified as

9   Mr. Reynoso.

10   A    The picture that he was shown of Mr. Reynoso, he

11   positively identified as being Flaco.  Yeah, I can say that.

12   Q    But he also identified Flaco as having a skull tattoo on

13   his neck.

14   A    That's correct.

15   Q    And Mr. Reynoso does not have that on his neck.

16   A    Correct.

17   Q    In the Photograph 14, is there -- which Victim Number 2,

18   3, and 4 identified as being Flaco, there's no neck tattoo on

19   those photographs, is there?

20   A    No.

21   Q    And Victim Number 2 said that Mr. -- Flaco did not point a

22   firearm, correct?

23   A    That's correct.

24   Q    Victim Number 3 said that he -- that the person in

25   Photograph Number 14 did not hit him and was sorry that he was

1  having to do what he was -- he was there doing.

2  A    That's correct.

3  Q    And 4 said -- Victim Number 4 said that 14 had a gun and

4  was playing around with it, but never said he was pointing it

5  at him.

6  A    Correct.

7  Q    So the only person who says that he pointed a gun at him

8  in these -- in these first four victims, at least, is -- has

9  misidentified this person as Flaco, correct?

10  A    Correct.  Victim Number 1 did provide to us, as well as

11  the other victims, that he was separated from the other victims

12  because his family couldn't pay the full ransom.  So he was

13  treated worse than the other hostages, and the other victims

14  confirmed that as well.

15  Q    Sure.  I'm not contesting his --

16  A    Oh, gotcha.

17  Q    -- what happened to him.  I'm just saying that the person

18  he identified as Flaco and the person that he identified as

19  pointing a gun, has a skull tattoo on his neck, and that's not

20  this Mr. Reynoso.

21  A    Understood.

22  Q    How many -- so are you familiar that -- with this type of

23  trafficking case where there's coyotes and pollos and people

24  get to the States and then they then kind of up the ransom

25  for -- or up the transportation fees.  Are you familiar with

1  these type of cases?

2  A    To some degree, yes.

3  Q    Mostly kind of catching up in this case, I assume.

4  A    Certainly, but I did have some prior knowledge to that

5  kind of stuff.

6  Q    So the FBI got involved because Harris County got FBI

7  involved?

8  A    Correct, they requested our assistance.

9  Q    They didn't call the Border Patrol or try to call the

10  other agencies?

11           MR. GANZ:  Objection as to relevance.

12           THE COURT:  Mr. DeGeurin?

13           MR. DEGEURIN:  (Indiscernible).

14           THE WITNESS:  I'm not sure if they -- who they --

15  else they tried to contact.  I just know they contacted us.

16  BY MR. DEGEURIN:

17  Q    Are you -- are you familiar that often sometimes the

18  people who are -- who are there at these stash houses -- that's

19  not the word for it -- but the house where they're holding

20  people to be released, that sometimes the people that are --

21  that are there are all -- can be somewhat victims themselves

22  being by -- held by the captors?

23  A    No, I'm not aware of that.

24  Q    You understand sometimes they employ the -- they'll employ

25  people to feed -- will feed the detainees who may also be

1   detainees themselves?

2   A    Nobody's told me that yet, no.  I'm not aware of that.

3   Q    All right.  So in this case, on the day that -- of the

4   arrest, how many people were arrested?

5   A    On the day of the arrest, four people were arrested on

6   April 3rd.

7   Q    And one of those persons, or two of those people were in

8   the house, and two of those people were arrested after the

9   strip club?

10  A    Correct.

11  Q    And then the female was arrested.  Ms. Martinez was

12  arrested?

13  A    That's correct.

14  Q    Ms. Martinez also doesn't place that Flaco didn't have a

15  gun, right?  She said Flaco was not pointing a gun in that

16  picture.

17  A    In what picture are you referring to?

18  Q    Well, let me get to your report.  Well, let me just -- so

19  Ms. Martinez identified Number 11.  This is on your report,

20  Page of 4 of 10, on your 302.

21  A    Mm-hmm.

22  Q    She identified Picture Number 11 as Flaco, not Number 14.

23  A    That's correct.

24  Q    And it said that he was one of the friends at that house

25  the night of the party.  He was Dominican, very quiet.  But

1  nothing about a firearm, right?

2  A    Correct.  That was early on in the interview.  And then

3  she was shown his other picture, his DMV photo, later in the

4  interview, when she had kind of come around and become more

5  truthful.  And that's when she mentioned that she was with him

6  when they escaped the house.

7  Q    Right.  But let me add directly to Page 8 of that

8  same 302.  In Photograph 14, who did she identify Photograph 14

9  as?

10 A    The person that she knows by the name Jay.

11 Q    So did not identify Photograph 14 as Mr. Reynoso.

12 A    Well, these are different series of photographs than the

13 victims were shown on April 3rd.

14 Q    Okay.  Well, I should have been more clear.  I guess

15 Ms. Martinez was shown a different series of photographs?

16 A    Correct.  Victims 2, 3, and 4 were shown the same series.

17 Victim 1 was shown a separate due to the malfunction I

18 described, and then Ms. Martinez-Morales was shown a separate

19 series of photographs as well.

20 Q    And so she identified Photo 15 as Flaco.

21 A    She identified two photos.  She was shown two, one from

22 the Nest camera footage and one from his DMV photo, which at

23 that point we had identified him and had that photo available

24 to us to show her.

25 Q    And I'll point you to Page 9, second paragraph, where --

1    and this goes to what I was asking you before.  Ms. Martinez

2    said Flaco was not holding a gun.  About the fifth sentence

3    down or sixth sentence down.

4    A    Yeah, just give me one second.  You're on Page 9.  Is that

5    correct?

6    Q    Right.

7    A    Okay.  Oh, I gotcha.  That's correct.  She -- that's when

8    she was describing the -- when she walked in on the photograph

9    being taken of Victim Number 1 bound on the ground.

10    Q    So -- but at least -- at least through that report,

11    there's no mention of Mr. Reynoso having a firearm.

12    A    Yeah --

13    Q    She talks about him leaving the house with him and trying

14    to decide what to do, whether get on a Greyhound or not get on

15    a Greyhound, all these things, but never that she said that he

16    had a firearm.

17    A    That's correct.

18    Q    And at the time you interviewed her twice, first time she

19    was less forthcoming, second time she was more forthcoming, and

20    even when she had all the opportunity to tell you the truth,

21    she never said that Mr. Reynoso had a firearm.

22    Q    True, but I wouldn't say that she was 100 percent

23    forthcoming even by the end of the interview.

24    Q    Well, I guess we're -- that's true of all interviews,

25    right?  I mean, did she have a lawyer, I guess, at the second

1  interview?

2  A    No, it was all in one incident, basically.

3            MR. GANZ:  Judge, if I could just -- I believe the

4  agent -- was this one interview or two?

5            THE WITNESS:  It's one interview, and she was

6  mirandized part of the way through, and then she became more

7  truthful as the interview went on.

8  BY MR. DEGEURIN:

9  Q    And as she became more truthful, she never said

10 Mr. Reynoso had a firearm?

11 A    That's correct.

12 Q    So in your work in New York, or your work down here,

13 dealing with violent offenses, you find that often people will

14 use fake numbers or straw numbers to collect ransom or

15 collect  -- send money around?

16 A    Yes, oftentimes criminals will use numbers that are not

17 associated to them to evade law enforcement detection.

18 Q    In any case, whether Mr. Reynoso was involved or not,

19 you're not saying Mr. Reynoso was the king linchpin of this --

20 of this organization, right?  There were certainly people that

21 were running the show that may or may not have already been

22 arrested.

23 A    Correct.

24 Q    And those guys' names aren't showing up on Zelle or Cash

25 or anything like that, right?

```
1   A    Some of their names do appear on --

2   Q    But, to use your -- use a specific name that's your name

3   and it somewhat shows a lower level of involvement, right?

4   A    Potentially, yeah.

5   Q    I mean, it wouldn't make sense to use your own name and

6   collect a ransom that has your bank account, your phone number,

7   because it's very traceable.

8   A    I would agree, but I've also seen people that have been

9   described as leaders of this organization sending their

10  information, so I can't say that.

11  Q    And have you seen that people were being used?  I mean,

12  whether or not they were involved in it and maybe criminally

13  involved in it, but people were -- like even Ms. Martinez said

14  that she was being used somewhat by the people above her,

15  right?

16            MR. GANZ:  Objection.  That misstates testimony.

17            THE COURT:  You can answer.

18            THE WITNESS:  What's the question exactly?

19  BY MR. DEGEURIN:

20  Q    Ms. Martinez was explaining, in somewhat -- Ms. Martinez

21  was saying that there -- other people were making decisions in

22  the group, that she was doing what she was told.

23  A    To a degree, yes, that's what she described to me.

24  Q    Now, there are certainly people out that are -- that you

25  would still like to identify and get interviewed and
```

1   potentially arrested in this case, right?

2   A    Correct.

3   Q    There are people that have been identified in phone

4   numbers and also other photographs that are not in custody.

5   A    Correct.

6   Q    Have you found that there are other people who have been

7   identified as being skinny built or being Dominican that you're

8   still looking for?

9   A    Not particularly that description, no.

10  Q    Well, you certainly would be looking for a guy who had a

11  skull tattoo on his neck that was skinny going by the name of

12  Flaco.

13  A    Uh --

14  Q    He pointed a gun at one of the victims and he had a

15  skull -- a very distinctive skull tattoo, a skinny Dominican

16  named Flaco, you'd be looking for that person.

17  A    Sure.

18  Q    Right.  The person who dropped the firearm into the --

19  there was a -- one of the kidnappers, hostage takers, was

20  holding -- had a gun and then dropped it in the laundry room.

21  He was arrested, right?

22  A    The victims described that that's what he did with it.

23  That individual was arrested at the search warrant.  Correct.

24  Q    That can't be misidentified as Mr. Reynoso dropping a

25  firearm.  That person who dropped the firearm in the -- in the

1  laundry room and then kind of tried to hide with the victims

2  was arrested.

3  A    Correct.

4  Q    When -- so -- and once you were able to identify

5  Mr. Reynoso, I guess, after talking with Ms. Martinez, at some

6  point, you got a DMV photograph of Mr. Reynoso.

7  A    Correct.

8  Q    Was that your research or was that one of the analysis FBI

9  people who found it?

10 A    I believe I submitted a request to the Houston Op Center,

11 and they do the records check and then send it back.

12 Q    That was later in the investigation when you had a known

13 photograph of Mr. Reynoso.

14 A    It was after I had his identifying information, which is

15 how we would run a party.

16 Q    Once you had the identification and you had the numbers

17 and identification numbers and whatever they have, did you do

18 an investigation of Mr. Reynoso?

19 A    I --

20 Q    It's simple.  Basically , did you -- you found out where

21 he lived?

22 A    Correct.  We ran his -- a records check of him.  Yes.

23 Q    Sure.  And you learned that he was a permanent resident?

24 A    Correct.

25 Q    You learned that he lived with his mother and other people

```
 1   at that residence?
 2   A    I wasn't -- it was never made clear to me who he was
 3   living with at that residence.
 4   Q    Or did you -- were you aware that he had a job?
 5   A    No.
 6   Q    What did you do to try to determine where he was and how
 7   long he'd been in Harrisburg?
 8   A    I contacted the FBI's Philadelphia office that they have a
 9   Harrisburg resident agency.  I contacted an agent out there,
10   passed along the information that I had, and it's my
11   understanding that he did records checks with the local police
12   departments there to try to determine if there was any local
13   records of Mr. Reynoso.
14   Q    Did you find any?
15   A    I don't know.  I -- another agent conducted that, so I
16   don't recall if any local records came back to him.
17   Q    Did you -- so you just don't remember.  There may have
18   been or may not have been?
19   A    Possibly, yes.
20   Q    I don't know if you're familiar in detention hearings, we
21   were provided some reports by a U.S. pretrial, and they run a
22   criminal history check as well.  There was -- there was some
23   traffic violations in Pennsylvania.  Is that kind of what you
24   remember?  Some things to do with learner's permits and
25   disorderly conduct and stuff like that?
```

```
 1   A    Not specifically, I don't recall that.

 2   Q    But to be clear, you haven't seen that there was any --

 3   that Mr. Reynoso had any criminal convictions that concerned

 4   you?

 5   A    No, I don't recall him having extensive criminal history.

 6   Q    Did you have any concern that he had -- that he has any

 7   dangerousness in his background other than obviously the

 8   alleged conduct in this case?

 9   A    Just this incident.

10   Q    And -- but for the Victim Number 1 who misidentified

11   Flaco, the other one said he may have had a firearm, but he

12   didn't point it at me and he was sorry for what was going on,

13   and that he was doing -- just doing a job, right?

14   Q    That's a combination of what multiple victims said but

15   yes.

16   Q    Okay.  I'm trying to confuse you.

17   A    No worries.

18   Q    Did you look in -- did you -- did you find that he had an

19   unauthorized use of a motor vehicle in Dimmit County?

20   A    Not that I recall.

21   Q    Do you know where Dimmit County is or -- in Texas?  Have

22   you been here long enough to --

23   A    I do not know.

24   Q    I think Carrizo Springs.

25   A    Okay.
```

1   Q     Okay.  When -- were you there when Mr. Reynoso was

2   arrested in Harrisburg?

3   A     I was not.

4   Q     Do you understand that the arrest was noneventful?

5   A     It's my understanding that there was -- yeah, there was

6   no -- it -- he was arrested without incident, I guess.

7   Q     Okay.  He didn't try to run.  He was -- he came down.

8   They called his name, he came down, he was arrested.

9   A     That's my understanding.

10  Q     And I assume he also -- you took a phone from him at that

11  time.

12  A     The officers that arrested him did.

13  Q     I would have guessed by -- because he was only arrested

14  last week, that there's not been any review of that phone at

15  this point.

16  A     That's correct.

17  Q     So in looking at the main people who have been indicted in

18  this case, the majority of them are Mexican citizens or are of

19  Mexican descent.  Do you know that?

20  A     No, they're not.  It's kind of a combination of people.

21  Q     Where was Siete (phonetic) from?

22            MR. GANZ:  Objection as to relevance.

23            THE COURT:  Sustained.   Let's move on.

24  BY MR. DEGEURIN:

25  Q     Did anyone speak to Mr. Reynoso or try to interview him

1    while he was -- when he was arrested in Harrisburg?

2    A    I don't believe so.

3    Q    The -- in Government's Exhibit Number 2, did you do a

4    trace of the other two phone numbers in those cases?

5    A    Yes, we did exigent requests for those phone numbers as

6    well as the 1629 number.

7    Q    And were you able to identify the people who are named

8    Sergio -- well, S.R. or S.P.?  I'm abbreviating the numbers in

9    those -- in the exhibit.  Were you able to identify those

10   people?

11   A    We identified people by those names.  Whether that's the

12   person that holds those numbers, I don't know.

13   Q    And that's a good point.  I guess phone numbers and where

14   phones are, it doesn't necessarily say where a person is.  It

15   says where that phone is.

16   A    Correct.

17   Q    Do you have any indication that the two -- second two

18   phone numbers in the Government's Exhibit Number 2 have any

19   relationship to Mr. Reynoso?

20   A    Yes, he's the recipient on Zelle transactions from both of

21   those people.

22   Q    I'm saying the identity of those people related to him.

23   You already testified, too, that there was some transactions

24   back-and-forth.

25   A    Yeah.

```
 1   Q    But those two people that you don't have any

 2   identification or any known --

 3   A    What his -- what their relation are to him, I'm not aware.

 4              MR. DEGEURIN:  I'll pass the witness.

 5              THE COURT:  Any redirect?

 6              MR. GANZ:  Just briefly.

 7                        REDIRECT EXAMINATION

 8   BY MR. GANZ:

 9   Q    Special Agent, these individuals who were kidnapped, they

10   were illegal migrants coming in?

11   A    Correct.

12   Q    Okay.  So Counsel made a point of saying it's sort of

13   stupid to use an account that has your name and phone number on

14   it to receive a ransom payment.  Let me ask you this.  Are

15   illegal immigrants uniquely vulnerable to kidnapping for ransom

16   schemes?

17   A    Yes, they are.

18   Q    And why is that?

19   A    Because they're already conducting illegal activity by

20   being in this country, and therefore they're less likely to

21   report this to law enforcement for fear of --

22   Q    For fear of deportation.

23   A    Correct.

24   Q    Okay.

25              MR. DEGEURIN:  Just briefly, Judge.  Oh, I'm sorry.
```

```
 1   Are you done?

 2              MR. GANZ:  (Indiscernible).

 3   BY MR. GANZ:

 4   Q    Your report talked about Flaco didn't hold a gun when

 5   Exhibit 1 was taken?

 6   A    Correct.

 7   Q    But Flaco was in the room when the photo was taken?

 8   A    Correct.

 9   Q    Okay.  To be clear, the hostages said that he was their

10   guard?

11   A    Correct.

12   Q    In other words, he was preventing them from leaving?

13   A    Correct.

14   Q    As they were being held against their will?

15   A    Correct.

16   Q    As their families were being extorted?

17   A    Correct.

18   Q    As they were being threatened with being killed?

19   A    Correct.

20   Q    As they were being beaten?

21   A    Yes.

22   Q    And this occurred over, I believe, four different

23   locations that he was a part of this conspiracy?

24   A    Yes.

25              MR. DEGEURIN:  I'm going to object to leading.
```

```
 1   That's -- and it's also going over the same -- it was already

 2   asked and answered.

 3               THE COURT:  (Indiscernible).

 4               MR. GANZ:  That's it, nothing further.

 5               THE COURT:  Thank you.  Any recross?

 6               MR. DEGEURIN:  Briefly.

 7                         RECROSS-EXAMINATION

 8   BY MR. DEGEURIN:

 9   Q    How many illegal aliens were -- how many people were being

10   detained at that facility?

11   A    Four were.

12   Q    So only four?  There were no others that were interviewed

13   and let go?

14   A    Yeah, correct.  Only the four victims were the four that

15   were found at that residence.

16   Q    Was there any indication that they had -- there were ever

17   more than four people at that residence?

18   A    Yes, there -- not particularly that residence, but there

19   were more involved in this ordeal.

20   Q    And those four people have been paroled into the United

21   States?

22   A    I'm not aware their --

23   Q    Do you know if they're still here to be interviewed?

24   A    Yes.  I know that they're still in the United States.  I

25   don't know what their status is.
```

```
 1  Q    Do you know if they're in custody?

 2  A    To my knowledge, no, they're not.

 3            MR. DEGEURIN:  I'll pass the witness.

 4            MR. GANZ:  Nothing further.

 5            THE COURT:  May this witness be excused?

 6            MR. GANZ:  Yes, Your Honor.

 7            THE COURT:  (Indiscernible).

 8       (Witness excused)

 9            THE COURT:  Any other witnesses for the Government??

10            MR. GANZ:  No, Your Honor.

11            THE COURT:  Mr. DeGeurin, do you have any witnesses?

12            MR. DEGEURIN:  Not on probable cause, but I do have

13  on detention.

14            THE COURT:  Okay.  All right.  Well, I'll just make a

15  finding on probable cause first.

16            Based on the testimony presented today complete with

17  victims' identifications of the defendant, cooperator's

18  identification, the link to the defendant on the phone numbers

19  of the Zelle accounts and other testimony, the Court finds

20  sufficient evidence has been presented to establish probable

21  cause.  Does therefore order the defendant appear for all

22  further proceedings.

23            All right.  So let's then go to detention.  At this

24  time, does the Government have any anything else to add for

25  detention or any proffers it needs to make?
```

```
 1              MR. GANZ:  No, just other than the evidence that we

 2    presented, and I can tick off bullet points, but Your Honor's

 3    heard it.

 4              THE COURT:  You can save that for argument.

 5              Mr. DeGeurin, do you have any witnesses for --

 6              MR. DEGEURIN:  I do.  I would call Juana Rodriguez --

 7    Reynoso-Rodriguez.  And she'll need an interpreter.

 8              THE COURT:  Okay.

 9        JUANA REINOSO-RODRIGUEZ, DEFENDANT'S WITNESS, SWORN

10              THE CLERK:  You may be seated.

11              THE COURT:  And I just ask you to speak into the

12    microphone in response to these questions.

13              THE WITNESS:  Okay.

14              THE COURT:  You may proceed.

15                        DIRECT EXAMINATION

16    BY MR. DEGEURIN:

17    Q    Ms. Reynoso, can you state your name and spell it for the

18    record?

19    A    Juana Iris Reinoso-Rodriguez.  J-U-A-N-A I-R-I-S R-E-I-N-

20    O-S-O R-O-D-R-I-G-U-E-Z.

21    Q    Ms. Reynoso, the young man that's sitting next to me, do

22    you know who he is?

23    A    Yes, this is my son, Franyerson.

24    Q    And you live in Harrisburg, Pennsylvania?

25    A    Yes.
```

```
1    Q    How long have you lived in Harrisburg?

2    A    Five years.

3    Q    And before that, where did you live?

4    A    Massachusetts.

5    Q    And how long did you live there?

6    A    Two years.

7    Q    Where are you from originally?

8    A    From the Dominican Republic.

9    Q    And are you a permanent resident?

10   A    Yes.

11   Q    And how did you obtain your permanent residence?

12   A    Through my father.

13   Q    Your father is a U.S. citizen?

14   A    Yes, American citizen.

15   Q    Do you have other brothers and sisters who are U.S.

16   citizens?

17   A    Yes.  Yes.

18   Q    Now, you live -- what's your address in Harrisburg?

19   A    1909 North Street, Harrisburg, Pennsylvania.

20   Q    And who lives in that house with you?

21   A    My children and the son of a friend.

22   Q    How many is that?

23   A    In total, it's seven of us.

24   Q    And your son, Franyerson, Mr. Reynoso sitting next to me,

25   he lives with you?
```

```
1   A    Yes.

2   Q    Let me -- off the bat, do you know anything about these

3   allegations about your son?  Do you have any personal knowledge

4   about the allegations of your son?

5   A    Yes, the attorney did tell me.

6   Q    Only what the attorney told you.

7   A    Yes.

8   Q    I'm going to show you what's marked as Defendant's

9   Number 1.  Do you recognize that photograph?

10  A    Yes.  It's his graduation.

11  Q    This is -- who is in the picture?

12  A    Franyerson Pujols Reynoso.

13  Q    And this is your son?

14  A    Yes, he's my son.

15          MR. DEGEURIN:  I'd like to admit --

16          MR. GANZ:  No objection.

17          MR. DEGEURIN:  -- Defense Exhibit 1.

18  BY MR. DEGEURIN:

19  Q    Did Franyerson go to high school here in the United

20  States?

21  A    Yes.

22  Q    Did he graduate from high school?

23  A    Yes.

24  Q    And where did he -- where did he work after high school?

25  A    He worked at SBO, he worked for Presidente.  And --
```

```
 1                THE INTERPRETER:  May I ask for --

 2                MR. DEGEURIN:  Yeah.

 3                THE WITNESS:  And --

 4                MR. DEGEURIN:  I'll ask -- let me ask another

 5   question.

 6   BY MR. DEGEURIN:

 7   Q    Did -- at some point did he also work for Amazon?

 8   A    Yes, that was his last -- that was his last job there.

 9   After Amazon, he worked construction with me.

10   Q    And what do you do for a living?

11   A    Basically, I cater breakfast for workers, and right now I

12   got a contract for Lowe's.

13   Q    And so you work for Lowe's, and that's the -- like Home

14   Depot, Lowe's?  Lowe's is a big company?

15   A    No, I work for myself.  I cater -- I sell them the

16   breakfast for their workers.

17   Q    Right, but Lowe's -- and Lowe's is the home improvement

18   store, correct?

19   A    Yes, home improvement.

20   Q    And you have a contract to make food for the employees?

21   A    Yes, we still haven't executed it yet because I have to

22   come here to come look for my son.

23   Q    And so -- yeah.  Okay.  If your son were to be released,

24   can he come live with you?

25   A    And work with me, too.
```

1  Q    That's what I guess I was getting to.  That you have --

2  you're employed -- self-employed with a contract with a big

3  company to provide food.

4  A    (Answers in Spanish).

5  Q    And you work out of your home.

6  A    Yes.

7  Q    And so you would be at your home, and Mr. Reynoso would be

8  working alongside with you.

9  A    Yes.

10  Q    If the Court were to release your son into your custody,

11  would you make sure that he was -- he stayed in Harrisburg?

12  Q    That was my next point.  He would be working for you with

13  a contract to work for another company selling food.  And you

14  work out of your home?

15  A    Yes, I will make sure he will -- he stays in Harrisburg,

16  and whenever he needs to come down for court I'll come with

17  him.

18  Q    Are you a close family?

19  A    Yes.

20  Q    Does he have an uncle, Richard Reynoso, who lives close

21  by?

22  A    Yes.

23  Q    And Richard Reynoso is a U.S. citizen?

24  A    Yes.

25  Q    And are you aware that Richard Reynoso -- or Tio Richard,

```
 1   would also allow your son to live with him if that's what the

 2   Court ordered?

 3   A     Yes.

 4   Q     This is a silly question, but do you have any criminal

 5   history?

 6   A     No.

 7   Q     You -- you've been in court today and listening to the

 8   testimony, correct?

 9   A     Yes.

10   Q     But you don't speak English?

11   A     No.

12   Q     So you really couldn't hear what the agent had to say?

13   A     No.

14   Q     The allegations that the Government are making are very

15   serious.  The potential sentence for your son, if he were to be

16   convicted, could be life.  Do any of those factors change the

17   fact that you would let him come stay with you, make sure that

18   he had a job, and make sure that he came to court?

19   A     Nothing changes.  Everything is the same.

20   Q     Did you bring your son's passport with you here to

21   Houston?

22   A     Of course I did.

23   Q     If the Court required that you turn over the passport,

24   would you have any problem giving it to the court clerk?

25   A     None at all.
```

```
 1  Q    Franyerson's father, is he still your husband?

 2  A    Yes.

 3  Q    Is he also in the process of becoming a permanent

 4  resident?

 5  A    Yes.

 6  Q    How many of your children are permanent residents?

 7            MR. GANZ:  Objection as to relevance.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  My four children are legal residents.

10  BY MR. DEGEURIN:

11  Q    Your grandfather was also -- was born here in the United

12  States?

13  A    No.

14  Q    How did your father get his residence -- or his

15  citizenship?

16  A    His sister brought him -- his sister brought him over, he

17  became a resident, then he applied for citizenship, and in due

18  time he got his citizenship.

19  Q    And he's still alive?

20  A    Yes.

21  Q    And he lives in Massachusetts?

22  A    Yes.

23  Q    When you learned of your son's arrest -- were you at the

24  house when he was arrested?

25  A    Not me.  No, I wasn't.
```

```
 1   Q    But immediately at that point, did -- after his arrest, he
 2   was taken to court in Harrisburg?
 3            MR. GANZ:  Judge, again, I'm going to object as to
 4   relevance.
 5            THE COURT:  Overruled.
 6            THE WITNESS:  Yes.
 7   BY MR. DEGEURIN:
 8   Q    And you were interviewed by Pretrial.  Were you ever --
 9   did United States Probation or somebody from the Government
10   talk to you about your home, your children, and the ability for
11   you to have your son come live with you?
12   A    Yes.
13   Q    And you agreed then also that you would take -- you would
14   take your son into your custody and make sure that he came to
15   court.
16   A    Yes.
17            MR. DEGEURIN:  I'll pass the witness.
18            THE COURT:  Cross?
19            MR. DEGEURIN:  No questions.
20            THE COURT:  Anything further?
21            MR. DEGEURIN:  No, Your Honor.
22            THE COURT:  May this witness be excused?
23            MR. DEGEURIN:  Yes, and Defense rests.
24        (Witness excused)
25            MR. DEGEURIN:  Although I do have -- I do want to
```

1    address the -- she may be excused.  I do want to address some

2    inconsistencies in the report to the Court from Probation.

3              THE COURT:  Okay.

4              MR. DEGEURIN:  And I don't know if you wanted to --

5              THE COURT:  (Indiscernible) you can do that through

6    argument.

7              MR. DEGEURIN:  Okay.

8              THE COURT:  Is there anything further, Mr. DeGeurin?

9              MR. DEGEURIN:  I guess I would proffer the testimony

10   of Richard Reynoso, who is the uncle of the defendant.  I spoke

11   to him today, and he said that if he were called to testify

12   that he'd say that he's a U.S. citizen, that he lives very

13   close to the family, that he does not have any criminal history

14   other than traffic tickets, and that he would allow his nephew

15   to come live with him if the Court required that.  He'd also

16   help the family make sure that he made any trip or any required

17   appearances in the Houston area.  And then the Defense rests.

18             THE COURT:  All right.  Let's hear argument on

19   detention, Government.

20             MR. GANZ:  Looking at the factors in 3142,

21   considering the strength of the case, multiple victims

22   identify -- multiple victims identify Mr. Reynoso as being at

23   the house, being there for the full ordeal during which they

24   were moved to four different locations.  He's there the entire

25   time.  He's identified by a co-conspirator who says, yep, he

 1    was there.  And he was in the room when that horrible

 2    photograph, Government's Exhibit 1, was taken.  His phone was

 3    in the area of the Harby Street house during the time of the

 4    crime.  His phone was also tracked to Pennsylvania.  And he's

 5    most damningly connected via the Zelle payments.  His name is

 6    on Government's Exhibit 2 where they say, send the ransom

 7    payments to this person at this phone number.  And then Zelle

 8    records have him transacting money and receiving it.  So he's

 9    in it up to his neck.

10         Is he a danger to the community?  He's part of a

11    conspiracy in which the hostages were repeatedly beaten,

12    repeatedly threatened being killed.  When the hostages'

13    families are killed -- call law enforcement.  We know where you

14    live.  We're coming for you.  They extorted substantial sums of

15    money.  I believe it was $60,000 total.  And they did all this

16    while using firearms.

17         Along those lines, multiple victims say that he had a

18    gun -- that Mr. Reynoso was carrying a gun, guarding them,

19    preventing them from leaving.  And one of the victims said if

20    he tried to leave, he thought he'd be killed.  And there's

21    Mr. Reynoso standing in the room with a gun on him.

22         Is he a risk of flight?  This organization moved

23    people across the border to San Antonio, and then to Houston,

24    and then went into Houston to four separate houses.  They've

25    got lots of resources.  They've got multiple people working on

```
 1   this.  And they took multiple hostages and moved them through
 2   that very complex series of events, which means they're well-
 3   resourced.  The most telling and most damning thing is when the
 4   FBI says, come out, we're out front, he breaks the window, runs
 5   out the back, gets an Uber, and then beats feet all the way
 6   across the country to Harrisburg, Pennsylvania.  Flight is
 7   evidence of guilt under the law.  And if his reaction to law
 8   enforcement is run like hell, then I think this Court can't
 9   trust him to be here.
10          To the extent that he -- some hostage said that he
11   expressed some sort of moral qualms about this, it's just a
12   job, I feel sorry for you, it didn't stop him from being there
13   for multiple days, holding a gun on them while they were
14   terrorized and held hostage.
15          I estimate his guidelines as a minimum of 210 months
16   with acceptance and as a maximum of 365 months if he goes to
17   trial and is convicted.  I'd also add that all the other
18   defendants in this case and the case he's about to be indicted
19   into have been detained.  He's a flight risk.  He's an extreme
20   danger.  The Court should detain him.  I thank the Court.
21          THE COURT:  Mr. DeGeurin.
22          MR. DEGEURIN:  Judge, I'd like to start by going
23   through the pretrial services report.  And I'll point out that
24   this -- do you have a copy of it?  You have a --
25          MR. GANZ:  I do.
```

1            MR. DEGEURIN:  Okay.  That --

2            THE COURT:  This is the one from Pennsylvania?

3            MR. DEGEURIN:  This is from Pennsylvania.  And so

4   it's not a criticism of the pretrial office here.  This is -- I

5   have a question as to the legitimacy of this report.  And that

6   is -- by an example is if you look at -- if you look at Page 4

7   and it -- which is assessment of nonappearance.  One is on the

8   Page 3 it says offense charged which is the offense -- instant

9   offense.  But it -- Number 2 says lack of familiar residence,

10  community, employment, property, and financial ties.  Well, not

11  only did they actually have that information in the first

12  couple pages, and they did talk to the family and realizing

13  that there was a strong family presence there.  I -- then I

14  also brought Ms. Reynoso here to clarify that.  So they do have

15  very strong ties.

16            It doesn't have to be ties to Houston.  It's ties to

17  the place where they are so that they won't flee Pennsylvania.

18  He has strong ties in Harrisburg.  He can live with his mother.

19  He has a job there.  It's a job in the house so that she can

20  keep him under 24-hour supervision.  He lives with four other

21  siblings.  He has a U.S. citizen uncle who lives nearby.  So

22  the lack of familiar and residential community employment

23  property, that's just -- that's not true.  He does have those

24  ties.

25            Second -- or in Number 3 they say substance abuse

1    history.  But if you go back to Page 3 it says the defendant

2    reported no substance abuse treatment history.  There is no --

3    and even in the very thorough examination by the prosecutor of

4    this case and of the FBI, there's no indication of any

5    substance abuse.  They just are throwing in language to access

6    detention.  So there is no substance abuse.

7            Lack of verifiable or legitimate employment, that's

8    untrue.  They were able to -- they are able to -- and if not

9    them not able to do it, I was able to do it showing that he has

10   employment and he had worked for Amazon before that which is

11   verified.

12           The pending charges, well that's a repetitive of

13   Number 1.  Ties to a foreign country.  There's no -- there

14   hasn't -- he is a permanent resident of the United States.

15   That's a very precious status that they have and -- but it is a

16   status, and he gets that status through his family, through his

17   mother, through his grandfather who's a U.S. citizen.  He

18   graduated from high school here in the United States.  He is as

19   an American as a recent immigrant can be.

20           Criminal history.  And then if we go to the criminal

21   history I kind of -- it has a lot of ink, but it does not say a

22   whole lot.  This is the arrest -- date of arrest when he was

23   19 years old in Adams Township Police Department is about

24   having  -- everything was withdrawn except for having a

25   learner's permit and not driving with somebody who's over 21,

1   which is a Class C, and then also disorderly conduct, which is

2   a Class C.  Those -- that's not criminal history.  I mean,

3   that's a -- that's not showing anything that he would not

4   appear.

5           And then there's this -- there's this pending charge

6   in Carrizo Springs that I asked the FBI agent whether they run

7   any criminal history, they even came up with it, and he hadn't

8   seen it.  That is -- that is Mr. Reynoso.  He has a pending

9   case.  He's out on bond on that, but as this Court knows,

10  Carrizo Springs it could be a year to two years before they

11  even put it on a -- on a docket.

12          But -- so he doesn't have -- he has no history of

13  fleeing other than I guess the Government's best argument is he

14  went out the back door when the CIRT team from Quantico came

15  with the -- you know, with I assume tactical gear coming in and

16  he leaves.  We know through experience in this district that

17  often it's like an anthill.  When things come in, people go out

18  the back door.  It's not a sign that he's going to flee from

19  court.  There is no indication that he wouldn't appear in

20  court.  In fact it's the opposite of that.  The indication from

21  his mother and from his uncle is that he would appear in court.

22          The assessment of danger, we talk about the instant

23  offense.  Well, that's always the case.  Prior arrests -- and

24  now I'm still going back to the report of the pretrial that

25  says prior arrests and convictions.  Well, there aren't any

1  except having a learner's permit when not having someone old

2  enough to ride, a Class C.  Safety concerns for the community.

3  We're talking about Harrisburg.  That's where he is.  He's not

4  in -- he's not in Houston.  He's not in the valley.  He's

5  actually out in Harrisburg.  This actually weighs in favor of a

6  release because he's not in this community that causes it.  And

7  then criminal history again, they list criminal history twice

8  for a Class C misdemeanor.  So I take a big challenge to this

9  pretrial report.

10          Now, yesterday or the day before when we were here in

11  court, I had his mother, who flew from Harrisburg with a

12  brother, Darwin (phonetic), flew here to be in court.  They

13  interviewed and they verified all the information about jobs,

14  about where he could live, and that she would bring him to

15  court.  There's an addendum.  It's not as lengthy as I would

16  like the addendum to be because they didn't readdress those

17  issues.  And they just -- the Pretrial just continues on with

18  the recommendation.  I think the recommendation should be

19  reconsidered.  But that's why we're here.  You can -- you can

20  make that consideration.

21          Mr. Reynoso is a permanent resident.  He has strong

22  ties to his community in Harrisburg, and he would come to

23  court.  The -- what I did point out in the cross-examination of

24  the FBI, that there are different layers of people involved in

25  this case.  And even if everything is to be believed that is

1  said by the testimony today, that he was a lower person of it,

2  that he was not a person that was possessing a firearm or

3  pointing a firearm at people, and he wasn't hurting people.

4  He's the one.  If you go through all the different things, and

5  I went through them, that they say he wasn't.  He was saying he

6  was sorry.  He was not the leader.  He was not the person that

7  was putting this up.  He's a young man who got caught up in

8  something potentially.  And I think that we can't convict him

9  now.  He's certainly -- the evidence is not -- is not presented

10 to conviction.  It's just whether or not he's going to show up

11 in court, and he will show up in court.

12         And I'd asked the Court to set a bond -- even if the

13 Court does an electronic monitoring or a GPS, that would be

14 something that they would be able to do.  And he could be on

15 house arrest with his mother since she's working there from the

16 home.  So I'd asked for those conditions to be set for

17 Mr. Reynoso.

18         THE COURT:  All right.  Thank you.  And Mr. DeGeurin,

19 all those points are well taken, and the Government's points

20 are well taken regarding risk of flight.  You know, the Court

21 is concerned with the fact that when FBI showed up, he jumped

22 out the back window, fled, and went to Harrisburg,

23 Pennsylvania, where he lives.  And apparently he's been living

24 there, according to the pretrial report, for several years.

25 And after hearing his mother's testimony, I do believe that

1    their intentions are pure, and that they would watch him, and

2    keep track of him, and make him show up.

3            On the other side, I -- the Court is concerned with

4    the fact that he was involved in this organization that has

5    resources, that went from the border to several different stash

6    houses, and that his mother stated that this was a close

7    family, yet she didn't have any idea of the allegations, or

8    there's no evidence that she knew that he was even gone, you

9    know, while this was being committed in Houston, or how long he

10   was gone, and was there any question of why he was gone, and

11   what he was doing.  So that does concern the Court with respect

12   to risk of flight under (f)(2).

13           If this were a case under (f)(2), just on -- just on

14   risk of flight, the Court would find by a preponderance of the

15   evidence that there would be sufficient conditions.  However,

16   the Court is going to find that, based on the evidence and the

17   testimony in this case, that there is very convincing evidence

18   that no condition or combination of conditions exists to

19   reasonably assure the safety of any other person or the

20   community, based on (f)(1), the defendant's participation in

21   this extremely egregious scheme.

22           Now, based on the victims' identification of the

23   defendant, several of them saying he had a gun, one of them

24   saying he had pointed a gun, although I know the defendant

25   questioned the identification on that one, but others said that

```
 1   he had a gun, that he was in the room while this one victim was
 2   being photographed, was being taken of this victim with guns
 3   pointing at his head, that he participated in this scheme from
 4   (indiscernible) where victims were beaten, threatened, that
 5   family members were threatened as well, that he acted as a
 6   guard and prevented these people from leaving.
 7   These victims were stripped of their clothing.  They were held
 8   ransom in the stash house, and were treated horribly.  The
 9   defendant also faces significant time if convicted in this
10   case.  In addition, he was -- the testimony of the evidence
11   showing that there were accounts linked to him where he was
12   receiving money from all these people that were being extorted.
13           Based on this evidence, the Government is going to
14   find that there are no conditions to reasonably ensure, by
15   clear and convincing evidence, the safety of any other person
16   or community.  This is an extremely egregious crime.
17   Circumstances are extremely egregious.  And therefore, the
18   Court will find that he is going to be detained based on that
19   pending trial in this case.  I will issue a detailed detention
20   order to follow.  But that is the Court's ruling at this time,
21   that you will be remanded to the custody of the marshals
22   pending trial in this case.
23           Is there anything further from either side?
24           MR. GANZ:  No, Your Honor.
25           MR. DEGEURIN:  No, Your Honor.
```

1          THE COURT:  Thank you all.  You're excused.

2          MR. GANZ:  Thank you.

3      (Proceedings concluded at 12:20 p.m.)

4                          *  *  *  *  *

5

6

7

8

9

10

11

12

13

14              **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20

21

22

23  _____

24  ALICIA JARRETT, AAERT NO. 428    DATE: July 3, 2024

25  ACCESS TRANSCRIPTS, LLC